**Original filed 8/4/06**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| PATRICK L. RICHARDSON,<br><br>                     Petitioner,<br><br>      v.<br><br>GEORGE GALAZA, Warden,<br><br>                  Respondent. | Case Number C 97-20847 JF<br><br>ORDER[1] DENYING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[re: docket no. 89] |

**I. BACKGROUND**

Petitioner Patrick L. Richardson ("Richardson") was convicted in the Monterey County Superior Court of first degree murder, Cal. Pen. Code § 187; three counts of residential burglary, Cal. Pen. Code § 212.5; burglary, Cal. Pen. Code § 459; two counts of assault with a deadly weapon, Cal. Pen. Code §§ 240, 245; unlawful penetration, Cal. Pen. Code § 289(a); and conspiracy to commit robbery, Cal. Pen. Code §§ 182, 212.5. Enhancements for use of a firearm were found to be true. On December 18, 1992, Richardson was sentenced to life without the possibility of parole, with a concurrent sentence of fifteen years and eight months. Richardson

---

[1] This disposition is not designated for publication and may not be cited.

1    currently is incarcerated at Corcoran State Prison, California.

2        The facts leading up to Richardson's conviction may be summarized as follows: Lester

3    Polk ("Polk"), John Drayton ("Drayton"), Eugene Ballance ("Ballance"), and Richardson entered

4    the Ward family home in Monterey County, California at approximately 2:00 a.m. on June 14,

5    1992, while a female companion, Antannette Durr ("Durr"), waited outside in a car.  The men

6    robbed the family of a large amount of cash, mostly in $100 denominations, sexually assaulted

7    the seventeen-year-old daughter, Roxie, and shot and killed Mr. Ward.

8        Mrs. Ward referred to the taller of the intruders as Richardson during her testimony, but

9    she never testified as to how she made this identification.  Roxie identified the taller intruder as

10   Richardson because the night light in her room allowed her to see Richardson's face, which was

11   only partially covered by a beanie type cap.  Durr testified that she drove Richardson and the

12   other three intruders to a drop-off point, where she handed Richardson his gun and he put on a

13   beanie type cap.  Durr also testified that shortly after the robbery Richardson arrived at her home

14   out of breath, sweaty and with what appeared to be barbed-wire marks on his arms.  The other

15   three accomplices arrived shortly thereafter.  According to Durr, Richardson told her that he

16   thought he had killed someone and then later that night called Durr while the police were at her

17   home and said, "Antannette I killed a man.  I love you."

18       Drayton also testified that Richardson was the man wearing the beanie type cap and that

19   after Mr. Ward was shot, Richardson emerged from the closet and said, "He tried to kill me."

20   Durr's father, Zollie Durr ("Zollie"), testified that he discovered Richardson and the three other

21   intruders in his daughter's bedroom at about 3:30 am on the night in question.

22       The police arrested Richardson and Polk the following morning in a motel room paid for

23   with a $100 bill.  Inside the room, police found $2,416, almost all in $100 denominations.  While

24   taking Richardson to a correctional van, Sergeant Kaiser heard Richardson remark to Polk,

25   "Antanette, the bitch ratted us off."  A beanie type cap was found discarded outside the Ward

26   household.  The beanie type cap was identified by Durr, Drayton, Mrs. Ward and Roxie as the

27   one that Richardson was wearing on the night in question.  Forensic testing of the hairs in the cap

28

2

1  did not match the hairs to Richardson,[2] but Richardson's counsel never presented this negative
2  test information to the jury.

3          Direct Appeal

4          Richardson's conviction was affirmed by the California Court of Appeal on October 20,
5  1994.  Richardson contended on appeal that: (1) there was insufficient evidence to corroborate
6  the accomplice testimony for a conviction of conspiracy; (2) there was insufficient evidence to
7  support a finding that the unlawful penetration was a natural consequence of any conspiracy or
8  act of aiding and abetting committed by appellant; (3) the jury instruction defining reasonable
9  doubt deprived him of due process of law; and (4) his sentence on the unlawful penetration count
10  and an enhancement should have been stayed under section 654 of the California Penal Code.
11  On February 2, 1995, the California Supreme Court denied Richardson's petition for review.

12          Original Federal Petition

13          Richardson, acting *pro se*, filed a federal petition for writ of habeas corpus on September
14  24, 1997.  He asked that this Court consider the claims presented to the state appellate court.
15  Richardson also filed a motion to stay so that he could exhaust additional claims of: (1)
16  ineffective assistance of counsel at trial and on appeal; (2) denial of due process and fair trial; (3)
17  improper exclusion of blacks from the jury; and (4) abuse of discretion by the trial court.

18          On April 29, 1998, Judge Whyte dismissed as unexhausted the claim of insufficient
19  evidence to corroborate the accomplice testimony and the claim involving a stay of sentence
20  under section 654 of the California Penal Code.  The Court also dismissed the claim regarding
21  the jury instruction as not presenting a cognizable federal claim.  Only the claim involving
22  unlawful penetration and conspiracy was held to be cognizable.  On May 7, 1998 the instant case
23  was reassigned to the undersigned.

24          Motion for Leave to Amend Federal Petition

25          On January 19, 1999, Richardson requested that newly exhausted claims be consolidated
26  with his pending habeas claims.  Specifically, he sought to add claims of ineffective assistance of

27  _____

28      [2] Forensic comparison of Polk's hairs and the hairs in the beanie cap were also negative.

3

1   counsel at trial and on appeal.[3]  These claims were presented to the California Supreme Court in

2   a habeas petition, which petition was summarily denied on November 24, 1998.  This Court

3   treated the request for consolidation of claims as a motion to amend the petition.

4          On May 17, 1999, Respondent filed a motion to dismiss the petition in conjunction with

5   an opposition to Richardson's motion to amend.  Respondent argued that the petition was

6   unexhausted because the only cognizable claim in the original petition stayed by this Court was

7   not presented to the California Supreme Court, and that the petition was untimely because it was

8   filed after expiration of the statute of limitations imposed by the Antiterrorism and Effective

9   Death Penalty Act ("AEDPA").  Respondent further argued that the motion to amend should be

10  denied as an abuse of the writ.  On November 10, 1999, this Court denied the motion to amend

11  and dismissed the petition without prejudice.[4]

12         On June 7, 2002, the Ninth Circuit reversed this Court's decision and remanded the

13  petition for further proceedings.  The Ninth Circuit stated that petitioners must be provided "'the

14  opportunity to amend their mixed petitions by striking unexhausted claims as an alternative to

15  suffering dismissal . . . .  Federal Rule of Civil Procedure 15(a) . . . applies to habeas corpus

16  actions and requires district courts to allow amendment of mixed federal habeas petitions.'"

17  *Richardson v. Galaza*, No. 00-15871 (9th Cir. 2002) (quoting *Anthony v. Cambra*, 236 F.3d 568,

18  574 (9th Cir. 2000)). The court found the abuse of writ doctrine to be inapplicable.  Accordingly,

19  it held that Richardson should be given the opportunity to amend his petition to state only

20  exhausted claims.  The court noted that "the petition will be facially untimely [so this Court]

21  should determine whether equitable or statutory tolling applies.  If the original petition is not

22

23         [3] Among the amendments, Richardson sought to add the operative claim for ineffective
24  assistance of trial counsel based on failure to use exculpatory hair sample evidence.

25         [4] The ground for dismissal was that the unlawful penetration claim was unexhausted and
26  that there were no extraordinary circumstances that would allow an unexhausted claim to be
    heard before a federal court.  The motion to amend was denied on the grounds that adding a
27  newly exhausted claim to an unexhausted claim would be futile because it would create a mixed
    petition, and that amending the petition would be an abuse of writ.
28

4

1  time-barred, [this Court] will also need to determine whether Richardson's amendment relates

2  back to the original petition." *Id.*

3          Amended Petition for Writ of Habeas Corpus:

4          This Court appointed counsel for Richardson on August 20, 2002.  Successor counsel was

5  substituted on June 3, 2003.  On February 27, 2004, Petitioner filed the operative amended

6  petition for writ of habeas corpus, in which he abandoned five of his six claims.  The only

7  remaining claim for relief is ineffective assistance of trial counsel based on failure to use

8  exculpatory hair sample evidence.[5]  Richardson claims that if this evidence had been presented

9  to the jury, the jury would have returned verdicts of not guilty to some or all of the charges

10  against him.  Richardson asserts that no procedural default has occurred, and if it has, there is

11  cause sufficient to excuse it.  Finally, Richardson argues that the original petition is not time-

12  barred and that his current claim relates back to the original petition.  In the alternative,

13  Richardson argues that his current claim is timely because it is based on the discovery of

14  exculpatory evidence in 1998.

15                              **II. DISCUSSION**

16  **A.    Timeliness**

17          As noted by the Ninth Circuit, Richardson's original petition is facially untimely because

18  he filed the petition five months after expiration of the AEDPA's one year statute of limitations.

19  The AEDPA, which was enacted on April 24, 1996, imposed for the first time a statute of

20  limitations on petitions for writ of habeas corpus filed by state prisoners.  A prisoner with a

21  conviction finalized before April 24, 1996, had until April 24, 1997 to file his or her habeas

22  petition under the AEDPA statute of limitations.  *Malcom v. Payne*, 281 F.3d 951, 955 (9th Cir.

23  2002); *Calderon v. United States (Beeler)*, 128 F.3d 1283, 1288-89 (9th Cir.1997), overruled on

24  other grounds by *Calderon v. United States Dist. Court (Kelly)*, 163 F.3d 530 (9th Cir.1998) (en

25

26          [5] On October 2, 1992, there was a forensic comparison of the hairs from the beanie type
27  cap with Richardson's hair.  The results indicated that the hairs from the cap did not match
   Richardson's.  Richardson claims that he first became aware of the test results when he received
28  responses to a discovery motion in June 1998.

                                           5

1    banc).  Richardson filed his petition on September 24, 1997, five months after the statute of

2    limitations expired.  Richardson argues that his petition nonetheless is timely because of

3    equitable tolling of the original petition and relation back of the amended petition.  Alternatively,

4    Richardson argues that the evidence regarding the forensic testing of the hair samples is newly

5    discovered evidence, which would in essence toll the statute of limitations for the instant claim.

6    1.    *Equitable Tolling of Original Petition*

7            The statute of limitations may be equitably tolled when "extraordinary circumstances"

8    beyond a prisoner's control make it impossible for him or her to file a petition on time.  *Miranda*

9    *v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002); *Calderon (Beeler)*, 128 F.3d at 1288.  The

10   threshold for equitable tolling is very high and difficult to meet; the petitioner must establish "(1)

11   that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances

12   stood in his way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *see also Rasberry v. Garcia*,

13   448 F.3d 1150 (9th Cir. 2006); *Miranda*, 292 F.3d at 1066.  Due diligence is required of the

14   petitioner to learn the laws.  *See Hizbullahankhamon v. Walker*, 255 F.3d 65, 67 (2nd Cir. 2001)

15   (holding that time in solitary confinement will not toll the statute if the petitioner does not

16   demonstrate reasonable diligence upon his return from confinement).  Furthermore, an

17   "extraordinary circumstance" does not necessarily include transfers between prison facilities,

18   solitary confinement, lockdowns, restricted access to the law library or the inability to secure

19   court documents.  *See Lindo v. Lefever*, 193 F. Supp. 2d 659, 663 (E.D.N.Y. 2002).  The Ninth

20   Circuit has tolled the AEDPA's statute of limitations in limited circumstances including

21   instances where counsel withdrew from a case and left a paper mess that the succeeding attorney

22   could not follow, mental incompetency of the prisoner, and prison guards failing to mail a

23   petition correctly.  *See Calderon (Kelly)*, 163 F.3d at 541; *Calderon (Beeler)*, 128 F.3d at 1288-

24   89; *Miles v. Prunty*, 187 F.3d 1104 (9th Cir. 1999).

25           Richardson contends that equitable tolling applies to the instant petition for the following

26   reasons: yard "3B" in which he originally was housed at Corcoran State Prison did not provide

27   access to legal materials; he was transferred multiple times and each transfer was accompanied

28   by a three week period during which he could not access his belongings; he was placed in

6

1    administrative segregation; and he was subject to numerous emergency lockdowns which slowed

2    down his legal processes.  Richardson submitted a record of transfers including a transfer from

3    Pelican Bay to Salinas Valley State Prison ("SVSP") on June 12, 1996 and a transfer from SVSP

4    to Corcoran State Prison on March 27, 1997.   *See* Richardson's Chronological Prison History.

5    The record includes other transfer and intake audits, but it is entirely unclear what impact, if any,

6    these had on Richardson's ability to file a habeas petition.  *Id.*  The only lockdowns for which

7    Richardson provides documentation occurred in 1998[6] and 1999.[7]  *See* Motion for Extension of

8    Time filed November 30, 1998, Ex. A; *see also* Motion for Extension of Time filed February 24,

9    1999, Ex. A.   Richardson also submits a notice of administrative segregation for SVSP dated

10   March 21, 1997.  *See* "Order and Hearing for Placement in Segregation."   It is unclear how long

11   Richardson was held in administrative segregation, but the period likely was very short, as he

12   transferred prisons six days after the notice of administrative segregation was implemented.

13       Based upon this record, the Court concludes that Richardson has failed to meet the high

14   threshold for equitable tolling.  He contends that he did not learn of the AEDPA's statute of

15   limitations until he was transferred from Yard "3B" to Yard "3A," where other inmates informed

16   him of the new statute of limitations.  Ignorance of the AEDPA enactment does not constitute a

17   ground for tolling.  *See Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998).  Moreover,

18   Richardson was not transferred to yard "3B" until eleven months *after* the AEDPA was passed.

19   He claims that during those eleven months he was subjected to various transfers and lockdowns.

20   However, he does not provide a declaration setting forth the exact dates of these alleged transfers

21   and lockdowns.  He does not explain how each lockdown, administrative segregation or transfer

22   affected him and his access to legal materials. As a result, he has failed to demonstrate that the

23   alleged lockdowns and transfers prevented him from filing a timely habeas petition.  Moreover,

24   Richardson has failed to show that he exhibited due diligence in filing his habeas petition once he

25   became aware of the AEDPA's statute of limitations.  Accordingly, Richardson's request for

26   _____

27       [6] This lockdown lasted for approximately six days.

28       [7] It is unknown how long the lockdown in 1999 lasted.

7

1   equitable tolling with respect to the original petition will be denied.

2   *2.    Relation Back*

3       The Court need not address the relation back argument because there is not a timely claim

4   to which the current claim could relate back.

5   *3.    Newly Discovered Evidence*

6       The one year statute of limitations begins to run on "the date on which the factual

7   predicate of the claim or claims presented could have been discovered through the exercise of

8   due diligence." 28 U.S.C. § 2244(d)(1)(D). Thus, discovery of evidence that gives rise to a new

9   claim will commence the statute of limitations as long as the petitioner exercised due diligence to

10  discover the evidence. *Souter v. Jones*, 395 F.3d 577, 587 (6th Cir. 2005); *Redd v. McGrath*, 343

11  F.3d 1077, 1083 (9th Cir. 2003). The test for newly discovered evidence "requires that the

12  evidence 'must be such, and of such nature, as that, on a new trial, the newly discovered evidence

13  would *probably produce an acquittal*.'" *U.S. v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir. 1994)

14  (original emphasis) (quoting *U.S. v. DeRewal*, 10 F.3d 100, 104 (3rd Cir.1993)). "[T]he

15  evidence must be material to the issues involved, not merely cumulative or impeaching, and must

16  indicate that a new trial probably would produce an acquittal." *U.S. v. Lopez*, 803 F.2d 969, 977

17  (9th Cir. 1986).

18      Richardson contends that the instant habeas corpus petition is based on forensic test

19  results that did not become available to him until he received documents in response to a

20  discovery motion in June 1998. Am'd Pet. p. 8. He argues that had the forensic test results for

21  the hair in the beanie type cap been presented at trial, he would have been acquitted of one or

22  more charges because he was identified at trial as the perpetrator wearing the beanie type cap.

23  Richardson alleges that his counsel was ineffective for failing to present this information to the

24  jury.

25      Richardson has failed to demonstrate that he could not have asserted his ineffective

26  assistance claim before 1998. He does not assert ignorance that the forensic testing was *done*,

27  only ignorance of the *results* of the testing. Am'd Pet. p. 8. However, he was present throughout

28  his trial and thus knew that the test results were not introduced as evidence. At that point, he had

8

1    sufficient information at least to inquire of his counsel why the test results were not presented.

2    Moreover, even if Richardson was *not* put on sufficient notice of his ineffective

3    assistance claim at the time of trial, he did not exhibit due diligence in acquiring the information

4    necessary to bring the claim. *Six years* elapsed between Richardson's conviction and his request

5    for "a copy of hair sample analysis result." Richardson has not offered any explanation as to why

6    it took him so long to request these records. Because it concludes that the claim of ineffective

7    assistance is based upon evidence that in the exercise of due diligence could have been

8    discovered *years* before the expiration of the statute of limitations in 1997, the Court concludes

9    that the claim is time-barred. However, in light of the nature of Richardson's sentence and the

10   lengthy procedural history of the case, the Court also will address the merits of the claim. *See*

11   *Branco v. Nw. Bank Minn., N.A.*, 381 F. Supp. 2d 1274, 1285 (D. Haw. 2005).

12   **B.    Merits**

13   *1.    Legal Standard*

14   This Court will entertain a petition for writ of habeas corpus on "behalf of a person in

15   custody pursuant to the judgment of a State Court only on the ground that he is in custody in

16   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

17   The petition may not be granted with respect to any claim that was adjudicated on the

18   merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision

19   that was contrary to, or involved an unreasonable application of, clearly established Federal law,

20   as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

21   based on an unreasonable determination of the facts in light of the evidence presented in the state

22   court proceeding." 28 U.S.C. § 2254(d).

23   A state court's decision is "contrary to" clearly established federal law if the state court

24   arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if

25   the state court reaches a decision different from that reached by the Supreme Court on a set of

26   materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's

27   decision involves an "unreasonable application" of clearly established federal law if the state

28   court identifies the correct governing legal principle but unreasonably applies that principle to the

9

1    facts of the petitioner's case. *Id.* "[A] federal habeas court may not issue the writ simply

2    because the court concludes in its independent judgment that the relevant state-court decision

3    applied clearly established federal law erroneously or incorrectly.  Rather, that application must

4    also be unreasonable." *Id.* at 411.

5          A state court's decision is based upon "an unreasonable determination of the facts in light

6    of the evidence presented" when the state court fails to consider and weigh highly probative,

7    relevant evidence, central to the petitioner's claim, that was properly presented and made part of

8    the state-court record. *Taylor v. Maddox*, 366 F.3d 992, 1005 (9th Cir. 2004)  This Court must

9    presume correct any determination of a factual issue made by a state court unless the petitioner

10   rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

11   *2.      Ineffective Assistance of Trial Counsel*

12         Richardson's habeas petition asserting ineffective assistance of trial counsel was

13   summarily denied by the California Supreme Court on November 24, 1998.  Consequently there

14   is no reasoned decision addressing the ineffective assistance claim.  When there is no reasoned

15   state court decision addressing a habeas claim, this Court must conduct an independent review of

16   the record to determine whether the state court's decision was contrary to, or an unreasonable

17   application of, clearly established federal law. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th

18   Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  The Court does not accord a

19   state court's summary decision the same deference as a reasoned decision, because if there is no

20   reasoned decision on the merits, "there is nothing to which to defer." *Greene v. Lambert*, 288

21   F.3d 1081, 1088-89 (9th Cir. 2002).  The focus of the Court's inquiry nonetheless is whether the

22   state court's resolution of the case constituted an unreasonable application of clearly established

23   federal law. *Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir. 2001).[8]

24

25         [8] Richardson requests an evidentiary hearing.  However an evidentiary hearing should be
     granted only if a petitioner can show that "the claim relies on . . . a factual predicate that could
26   not have been previously discovered through the exercise of due diligence; and [] the facts
     underlying the claim would be sufficient to establish by clear and convincing evidence that but
27   for constitutional error, no reasonable fact finder would have found the applicant guilty of the
     underlying offense." 28 U.S.C. § 2254(e)(2).  Because Richardson has not met this burden, the
28

10

1      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

2  Amendment right to counsel, which guarantees not only assistance of counsel, but effective

3  assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for

4  judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

5  functioning of the adversarial process that the trial cannot be relied upon as having produced a

6  just result. *Id.*

7      Claims of ineffective assistance of counsel are reviewed pursuant to a two-prong test

8  established by the Supreme Court in *Strickland*. First, the petitioner must show that his counsel's

9  performance was deficient. This requires showing that defense counsel made errors so serious

10  that representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at

11  688. The relevant inquiry is not what defense counsel could have done, but rather whether the

12  choices made by defense counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173

13  (9th Cir. 1998). "Review of counsel's performance is highly deferential and there is a strong

14  presumption that counsel's conduct fell within the wide range of reasonable representation."

15  *Henley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995) (citation omitted). "Tactical decisions that are

16  not objectively unreasonable do not constitute ineffective assistance of counsel." *Id.*

17      Second, the petitioner must show that the deficient performance prejudiced the defense so

18  as to deprive the petitioner of a fair trial. *Strickland*, 466 U.S. at 687-88. Merely showing that

19  the defense was impaired is insufficient. *Id.* at 693. The petitioner must show that "there is a

20  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

21  would have been different." *Id.* at 694. A "reasonable probability" is defined as "a probability

22  sufficient to undermine confidence in the outcome." *Id.* It is "well-advised to bypass

23  scrutinizing a criminal-defense attorney's representation if the defendant cannot show that he was

24  prejudiced by it." *Weaver v. Palmateer*, --- F.3d ----, 2006 WL 1975894, at *4 (9th Cir. 2006).

25  The Court first considers whether Richardson was prejudiced by his counsel's failure to present

26  the forensic test results.

27

28  Court concludes that an evidentiary hearing is unnecessary.

1   At trial, Richardson's defense counsel did not try to persuade the jury that Richardson

2   was not one of the four accomplices.  The defense theory was that, while Richardson was

3   present, it was another of the intruders, Polk, who shot Ward.  Counsel stated in his opening

4   statement that:

5           On the night of June 14th, 1991, four men entered the Ward home.  They
    were Eugene Ballance, John Drayton, Lester Polk, and the fourth man was this

6       man right here. [Richardson] is, in fact, the fourth man who entered the Ward
    home that night.  The prosecution is not going to have to prove that he was the

7       fourth man.
        The evidence in this case must be examined closely by you, probably

8       closer than anything you've ever examined in your life, for the purpose of making
    a determination fairly and justly of just what crimes you believe have been proven

9       were committed by Mr. Richardson.

10   RT 167-68.  During closing argument, Richardson's defense counsel asked: "Who was the

11   aggressor in this case?  Who made all of the initial contacts?  Who made the phone calls?  Lester

12   Polk."  RT 790.

13   At trial, both Mrs. Ward and Roxie identified Richardson as the intruder with the

14   handgun who was wearing a beanie type cap.  According to Roxie, she was able to identify

15   Richardson because the beanie type cap did not fully cover his face when he entered her room.

16   She also testified that Polk had left the closet, where Ward had been struggling with the

17   intruders, before the fatal shot was fired.  The record does not state how Mrs. Ward identified

18   Richardson.  However, she did testify that Polk was in the bathroom when the fatal shot was fired

19   in the closet.  Both Mrs. Ward and Roxie affirmatively identified Polk at trial.  The forensic test

20   results might have countered this testimony to some degree, but it certainly would not have

21   compelled a jury conclusion that Richardson was not the intruder in the beanie type cap and thus

22   was not the shooter, particularly because the hair from the cap did not match that of Polk or any

23   of the other intruders, and there was no dispute that Richardson was one of the participants in the

24   crime.

25   There was other compelling evidence that Richardson was the shooter.  Durr, the female

26   accomplice who waited for the intruders in a get-away-car, testified that she drove the four men

27   to a drop-off point, where she handed Richardson his handgun, and where he put on the beanie

28

Case No. C 97-20847 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFEX1)

1  type cap.[9]  Durr also testified that after the incident, Richardson arrived at her home and told her,

2  "I think I hurt somebody.  I think I killed somebody."  Richardson was out of breath, sweaty and

3  had what appeared to be barbed-wire marks on his arms.  His clothes were dirty and wet.

4  Ballance and Drayton arrived a couple of minutes later, also out of breath and dirty.  Polk then

5  appeared banging on the Durr's front door.  Polk entered the house carrying a shotgun.  He too

6  was dirty and out of breath.  Durr also testified that after the four men left her home, Richardson

7  called her and told her that he had killed a man.

8      Drayton, another accomplice, testified against Richardson and in exchange he was

9  allowed to plead guilty to first degree murder.  He testified that Durr drove Richardson, Polk,

10  Ballance and Drayton to her neighborhood, and that all four men entered the Ward household

11  through an unlocked door.  Drayton identified the beanie type cap as the one Richardson was

12  wearing.  He also testified that after Ward was shot, Richardson emerged from the closet and

13  said, "He tried to kill me."

14      Richardson argues that the testimonies of Drayton and Durr are not credible as they

15  received more lenient plea bargains in exchange for their testimony.  However, accomplice

16  testimony may be relied upon if there is corroborating evidence that shows more than just "the

17  commission of the offense; and the circumstances thereof."  Cal. Penal Code § 1111.

18  Corroboration is sufficient if:

19  the prosecution [] produce[s] independent evidence which, without aid or
20  assistance from the testimony of the accomplice, tends to connect the defendant
   with the crime charged. The evidence need not corroborate the accomplice as to
21  every fact to which he testifies but is sufficient if it does not require interpretation
   and direction from the testimony of the accomplice yet tends to connect the
22  defendant with the commission of the offense in such a way as reasonably may
   satisfy a jury that the accomplice is telling the truth; it must tend to implicate the
23  defendant and therefore must relate to some act or fact which is an element of the
   crime but it is not necessary that the corroborative evidence be sufficient in itself
24  to establish every element of the offense charged. Although the corroborating
   evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient
25  if it tends in some degree to implicate the defendant.  [T]he corroborative
   evidence may be slight and entitled to little consideration when standing alone.

26  *People v. Lowery*, 200 Cal. App. 3d 1207, 1218 (1988) (internal citations and quotations

27

28      [9] Durr was given a plea bargain of second degree murder in exchange for her testimony.

13

1   omitted).  Here, there was corroborating testimony from Mrs. Ward and Roxie.  The California

2   Court of Appeal found that "[t]he most compelling evidence corroborating [Richardson's]

3   connection with the underlying crimes was that provided by the surviving victims, both of whom

4   identified defendant and detailed his participation in the offenses." *People v. Richardson*, No.

5   930A0413 (Cal. Ct. App. 1994).  The court further stated that "[Richardson's] connection with

6   the crimes was further corroborated by Zollie Durr's testimony which established the presence of

7   [Richardson] and his accomplices near the crime scene shortly after the commission of the

8   offenses, under circumstances indicative of flight, with the men in possession of a weapon

9   corresponding to the shotgun used in the robbery-murder." *Id.*

10       Having reviewed the record, this Court agrees with the state appellate court that there is

11   sufficient evidence, independent of the beanie cap, to corroborate the accomplices' testimony.

12   Under the circumstances, the Court concludes that Richardson was not prejudiced by his

13   counsel's decision not to present the forensic test results to the jury.  Defense counsel told the

14   jury in the opening remarks that Richardson was, in fact, one of the four accomplices.  There was

15   no dispute that one of the four accomplices was wearing a beanie cap.  As noted previously, there

16   is no evidence that the hairs from the cap matched those of *any* of the four men who entered the

17   home.  Given that the beanie cap must have been worn by one of the four men, evidence that the

18   hairs did not match Richardson's would not have made it any less probable that Richardson was

19   the one *among the four* who wore the cap.  Both Mrs. Ward and Roxie identified Polk as the

20   shorter man, not wearing the beanie cap, and stated that Polk was not in the closet when the fatal

21   shot was fired.  Mrs. Ward and Roxie also testified that neither Drayton nor Ballance were in the

22   closet at the time of the shooting.

23       It is "reasonably probable" that even if the forensic test results been presented to the jury,

24   the outcome of the case would have been the same.  Accordingly, the Court concludes that

25   Richardson was not prejudiced by his trial counsel's failure to present the forensic test results.

26

27

28

14

1

**III. ORDER**

2       Good cause therefore appearing, IT IS HEREBY ORDERED that the petition for writ of

3 habeas corpus is DENIED as time-barred and without merit.  The Clerk shall enter judgment and

4 close the file.

5

6 DATED: August 4, 2006

7

8                                                     /S/ _____

9                                                     JEREMY FOGEL
                                                      United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 97-20847 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFEX1)

1   This Order has been served upon the following persons:

2   Peggy S. Ruffra                    peggy.ruffra@doj.ca.gov, DocketingSFAWT@doj.ca.gov

3

4   Ronald A. Bass
    CA State Attorney General's Office
5   455 Golden Gate Ave
    Suite 11000
6   San Francisco, CA 94102-7004

7
    David P. Druliner
8   CA State Attorney General's Office
    455 Golden Gate Ave
9   Suite 11000
    San Francisco, CA 94102-7004
10

11  Stan M. Helfman
    CA State Attorney General's Office
12  455 Golden Gate Ave
    Suite 11000
13  San Francisco, CA 94102-7004

14
    Deanna F. Lamb
15  67 W. Linoberg
    Suite C
16  Sonora, CA 95370

17
    Bill Lockyer
18  CA State Attorney General's Office
    455 Golden Gate Ave
19  Suite 11000
20  San Francisco, CA 94102-7004

21

22

23

24

25

26

27

28

Case No. C 97-20847 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFEX1)